UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EDDIE CHAU,

    Plaintiff,

    v.

J. YOUNG; et al.,

    Defendants.

No. C 13-764 SI (pr)

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT**

## INTRODUCTION

Eddie Chau filed this *pro se* prisoner's civil rights action under 42 U.S.C. § 1983, claiming that defendants violated his rights under the First Amendment's Free Exercise Clause, RLUIPA, and the Fourteenth Amendment's Equal Protection Clause based on their decisions that caused him to be denied access to group religious activities for approximately three weeks. Defendants now move for summary judgment against Chau, and Chau opposes the motion. For the reasons discussed below, the motion will be granted and judgment entered in defendants' favor.

## BACKGROUND

The following facts are undisputed, unless otherwise noted:

The events at issue in this action occurred on and after August 22, 2011 at Salinas Valley State Prison's Facility A, where Chau was an inmate. Defendant R. Binkele was the facility captain of Facility A, defendant J. Young was a prison chaplain, and defendant A. Solis was the chief deputy warden at the prison.

One of the disruptive groups at Salinas Valley was the "2-5" disruptive group, which was comprised primarily, but not exclusively, of Hispanic and Latino inmates.[1] Association with this group crossed ethnic lines and was often based on a prisoner's housing locale. The "2-5" disruptive group was not based on any religious affiliation. At least one confidential document in Chau's central file identified Chau as an associate of the "2-5" disruptive group.

<u>The Riot And Ensuing Modified Program</u>: On August 22, 2011, a riot occurred on the Facility A recreation yard involving thirteen inmates. The riot involved a dispute between inmates affiliated with the "Mexican Nationals" disruptive group and the "2-5" disruptive group. Prison staff used chemical agents to quell the riot and recovered an inmate-manufactured weapon from the scene.

After prison officials stopped the riot, they implemented a modified program on Facility A for all known members and associates of the "2-5" and "Mexican Nationals" disruptive groups. Under the modified program, affected inmates were not allowed dayroom or exercise yard access, inmate jobs were suspended, all out-of-cell inmate movement was under escort and in restraints, inmates were fed in their cells, and inmates had to conduct any religious worship in their cells. The disallowance of religious group activities applied to all affected inmates, regardless of religious affiliation.

Chau was among the inmates put on the modified program. Facility staff put Chau on the modified program because confidential information in his prison file showed that he was an associate of the "2-5" disruptive group since at least 2010. As a result of his placement on the modified program, Chau was denied access to group religious services out-of-his-cell. He was denied access to Jumu'ah (Friday prayer which is "an obligatory practice of Islam)," "all Islamic study classes," "participation in Ramadan (the month of fasting obligatory to Islam) with other Muslim prisoners," and "all group prayer and communal study services." Docket # 1 at 7.

On September 8, 2011, prison staff began incremental releases of the inmates on modified

---

[1] A state regulation defines "disruptive group 1" as "any gang, other than a prison gang." Cal. Code Regs. tit 15, § 3000. That regulation also defines the term "gang" and separately defines a "prison gang" as "any gang which originated and has its roots within the department or any other prison system."

program in Facility A. Five inmates from each disruptive group in each housing unit were released to the exercise yard or the dayroom. When there were no additional incidents of violence, staff determined that it was safe to return the facility to normal program. On September 13, 2011, Facility A was returned to normal program and the modified program was terminated, about three weeks after it had begun.

<u>The Use of Modified Programs</u>: When there was inmate violence or potential violence, prison officials sometimes restricted inmate privileges to safeguard safety and security of inmates and staff at the prison during any investigation and until the situation calmed down. If officials determined that an incident involved a significant number of inmates or was the result of unrest between inmate groups, a prison or housing unit could be placed on lockdown or a modified program.[2] During a modified program, the inmates' out-of-cell movements – such as access to outdoor exercise, visiting hours, religious services, and the canteen -- were limited or suspended. The modified program could be apply to all the facility's inmates or to a subset, such as affiliates of prison gangs or disruptive groups. Prison officials returned inmates from a modified program to normal program in several steps. The first step was to try to stop the

---

[2]Lockdowns and modified programs are defined in a state regulation:

> Lockdown means the restriction of all inmates to their cells/dormitory beds encompassing no less than a Facility. True lockdowns are rare occasions, generally following very serious threats to institutional security and the safety of staff and inmates. The movement of any inmate to an assignment or resumption of any program would change the lockdown status of the program, returning the institution/facility to a diminished level of modified program or to normal program.
>
> Modified Program means the suspension or restriction of inmate program activities and/or movement that impacts less than all programs or less than all inmates. A Modified Program may either occur independently in response to an incident or unusual occurrence or may occur as a facility transitions from a lockdown to regular programming. Imposed restrictions may fluctuate as circumstances dictate with the goal of resuming regular programming as soon as it is practical. Modified programming will last no longer than necessary to restore institutional safety and security or to investigate the triggering event, and shall not target a specific racial or ethnic group unless it is necessary and narrowly tailored to further a compelling government interest. For those inmates whose movement has been restricted, movement may be authorized on a case-by-case basis for essential or emergency services such as medical, dental, mental health or law library visits. The routine and/or temporary restrictions on inmate movement or yard activities, which do not last longer than 24 hours, are not considered a program modification.

Cal. Code Regs. tit. 15, § 3000.

violence from spreading and prevent threats from materializing into actual violence. This was done by, among other things, suspending privileges and activities that normally allowed groups of inmates to interact. Without the opportunity to interact, the inmates were less able to orchestrate and engage in violence. Suspending group religious activities furthered the goal of reducing opportunities for inmates to orchestrate and engage in violence. Second, prison officials investigated the incident to determine whether and when it was safe to return to normal programming. Finally, officials attempted to restore inmate privileges as quickly as safety and security would allow. Typically, privileges were restored incrementally, with a few inmates being released to the yard and, if no violence occurred, more inmates under the modified program would be released each day until all inmates' privileges were restored.

<u>Group Religious Services at Facility A</u>: An inmate who wished to attend religious group services was required to, prior to the month in which he wished to attend group services, place his name on a monthly group services list for his religious denomination. A chaplain prepared a religious services list each month and submitted it to the facility staff for approval. Prison staff then reviewed the list to be sure that each inmate on the list was housed in the correct facility offering the services and was not classified in a custody status that disallowed attendance at the services. (Inmates on modified program were generally confined to their cells and therefore could not attend out-of-cell worship services, regardless of whether they had signed up for the services.) Once the group services list was approved, custody staff had to release those inmates from their cells for the religious services, unless there was a lockdown or other event restricting inmate movement. For security reasons, once the monthly group religious services list was finalized, the list could not be changed for the duration of that month and an inmate not authorized to attend services had to wait until the next month for approval to attend services.

Chau was on the religious services list for August 2011. When the modified program was implemented after the August 22, 2011 riot, he was unable to attend group religious services because he was subject to the modified program. Chau could not leave his cell to participate in some special Ramadan services, Jumu'ah, Islamic study classes, and group prayer. He was, however, able to engage in the in-cell observance of Ramadan, engage in other in-cell worship

4

1  and could meet with the Islamic services chaplain at this cell to discuss spiritual matters upon
2  request. After the modified program was lifted in mid-September, captain Binkele approved
3  Chau to attend group Islamic services for the following month, October 2011.

4  Chau submitted a grievance on August 25, 2011 contending that he was not a member of
5  the "2-5" disruptive group and therefore was wrongly put on the modified program and removed
6  from the religious services list. Defendant Binkele, as Facility A captain, signed the first level
7  decision that rejected Chau's inmate appeal.[3] Defendant Solis, as chief deputy warden, signed
8  the second level decision that rejected Chau's inmate appeal.

## DISCUSSION

A.  Motion To Dismiss RLUIPA Claim

Federal Rule of Civil Procedure 12(b)(6) permits a defendant to move to dismiss on the ground that there is a "failure to state a claim upon which relief may be granted." A motion to dismiss should be granted if plaintiff fails to proffer "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (abrogating *Conley v. Gibson*, 355 U.S. 41 (1957)). The court "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and must construe *pro se* pleadings liberally, *Hebbe v. Pliler*, 627 F.3d 338, 341-42 (9th Cir. 2010).

Chau alleges a claim for a violation of his rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1. RLUIPA does not authorize suits against state actors acting in their individual capacity. *Wood v. Yordy*, 753 F.3d 899, 904 (9th Cir. 2014). Chau was the master of his complaint and explicitly wrote that he sued the remaining three defendants only in their individual capacities. *See* Docket # 1 at 6. An RLUIPA claim for damages against them fails as a matter of law. Defendants are entitled to dismissal of the RLUIPA claim for damages.

---

[3] Chau's inmate appeal was "partially granted" at both the first and second levels, but the portion of the appeal that was granted did not pertain to the modified program or religious services list.

5

B.  Motion For Summary Judgment As To Free Exercise And Equal Protection Claims

    1.  Legal Standard for Summary Judgment

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (a fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). The moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citation omitted). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id.* at 631.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Here,

Chau's verified complaint is considered along with the evidence in his opposition (Docket # 43) in evaluating the motion for summary judgment.

### 2. Free Exercise Claim

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend I. "The first of the two Clauses, commonly called the Establishment Clause, commands a separation of church and state. The second, the Free Exercise Clause, requires government respect for, and noninterference with, the religious beliefs and practices of our Nation's people." *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). The free exercise right is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security. *See O'Lone v. Shabazz*, 482 U.S. 342, 348-49 (1987). In order to prevail on a free exercise claim, a prisoner must show a defendant burdened the practice of his religion without any justification reasonably related to legitimate penological interests. *See Shakur v. Schriro*, 514 F.3d 878, 883-84 (9th Cir. 2008).

Chau has offered evidence that he was a practicing Muslim and was denied access to out-of-cell religious services, at least some of which were obligatory for his Islamic religion. The court will assume for present purposes that his statements in his verified complaint are sufficient for a reasonable jury to conclude that he had a sincerely held religious belief in the need for participation in group religious services for Jumu-ah, Ramadan and group prayer. The analysis of his free exercise claim thus proceeds to a consideration of whether the denial of access to these group religious services was reasonably related to legitimate penological interests. *See O'Lone*, 482 U.S. at 349 (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

The Supreme Court has identified four factors for courts to consider when determining whether a regulation or practice is reasonably related to legitimate penological interests: (1) whether there is a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it," (2) "whether there are alternative means of exercising the right that remain open to prison inmates," (3) "the impact accommodation of the

1 asserted constitutional right will have on guards and other inmates, and on the allocation of 2 prison resources generally," and (4) the "absence of ready alternatives," or, in other words, 3 whether the rule at issue is an "exaggerated response to prison concerns." *Turner*, 482 U.S. at 4 89-90 (citation omitted).  The task in considering the *Turner* factors is not to balance the four 5 factors, but, rather, to determine whether the state shows a "reasonable" relation between the 6 policy and legitimate penological objectives, rather than simply a "logical" one. *Beard v. Banks*, 7 548 U.S. 521, 533 (2006).  While all justifiable inferences must be drawn in the non-movant 8 prisoner's favor with respect to matters of disputed fact, the Court's inferences must accord 9 deference to the views of prison authorities in disputed matters of professional judgment. *See* 10 *id.* at 529-30.  Unless a prisoner can point to evidence showing the policy is not reasonably 11 related to legitimate penological objectives, sufficient to allow him to prevail on the merits, he 12 cannot prevail at the summary judgment stage. *Id.* at 530.

13 With respect to the first *Turner* factor, the undisputed evidence shows a rational and valid 14 connection between a legitimate government purpose and the implementation of the modified 15 program that caused Chau to be unable to attend group religious services.  Prison security is a 16 compelling government interest, *see Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2000), and 17 protecting inmate safety is required under the Eighth Amendment, *see Farmer v. Brennan*, 511 18 U.S. 825, 832 (1994).  Prison officials had a legitimate penological purpose in restricting the 19 gathering/planning/fighting abilities of inmates thought to be affiliated with those who had 20 engaged in a riot in light of officials' constitutional duty to protect prisoners from violence at the 21 hands of other prisoners. *See Farmer*, 511 U.S. at 833; *Hearns v. Terhune*, 413 F.3d 1036, 1040 22 (9th Cir. 2005).  The undisputed evidence is that officials implemented the modified program 23 in response to a small riot, limited the modified program to inmates thought to be affiliated with 24 the disruptive groups that took part in the riot, intended the modified program to reduce further 25 violence, and terminated the modified program within about three weeks after starting it.[4]  The

---

[4] Although the modified program started on August 22, 2011, and ended on September 8, 2011 for Chau, he did not receive access to group religious services until October 2011 because the monthly list for September had already been finalized. Defendants provided evidence that the lag time in his access to group religious services was for security reasons. *See* Docket # 43-1

8

1  undisputed evidence also shows that Chau was included in the modified program because prison
2  officials believed he was affiliated with the "2-5" disruptive group, and there was documentation
3  about Chau to support that belief. The modified program was neutral in that it restricted various
4  out-of-cell activities, rather than only group religious activities, and did not single out any
5  particular religion's group activities for worse treatment. The connection between prison safety
6  and the temporary restrictions on Chau's access to group activities, including religious activities,
7  was strong.

8  As noted earlier, the second *Turner* factor is "whether there are alternative means of
9  exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 89-90. The denial
10 of access to group religious services did not deprive Chau of all means of exercising his religious
11 beliefs. Chau remained able to worship alone in his cell and had access, upon request, to an
12 Islamic services to discuss spiritual matters. *See O'Lone*, 482 U.S. at 352-53 (although there
13 were no alternative means for the prisoners on work detail to attend Jumu'ah services, the
14 prisoners nevertheless retained their ability to participate in other Muslim religious ceremonies
15 and practices, and that ability supported the reasonableness of the restriction). This factor favors
16 the conclusion that the restrictions on group religious activities caused by the implementation
17 of the modified program were reasonable. *See O'Lone*, 482 U.S. at 352.

18 The third *Turner* factor requires the Court to consider the "impact accommodation of the
19 asserted constitutional right will have on guards and other inmates, and on the allocation of
20 prison resources generally." *Turner*, 482 U.S. at 90. Allowing Chau access to the group
21 religious services during the modified program would have defeated the purpose of the modified
22 program, which sought to stem prison violence by disallowing inmates thought to be affiliated
23 with those who recently rioted from gathering and planning or engaging in further violence.

---

(Binkele Decl., ¶ 16) (custody staff members were required to release inmates on the list from their cells for the services; "[b]ecause the lists authorize the release of an inmate from his cell, safety and security of the institution require that, once a monthly group religious services list is finalized, the list may not be changed for the duration of that month."). The court defers to the prison administrator's decision that security was best-served by not allowing changes to the monthly list for release of inmates from their cells. *See Norwood v. Vance*, 591 F.3d 1062, 1068 (9th Cir. 2010).

9

Allowing Chau (or any other affiliate of the "2-5" or "Mexican Nationals" disruptive groups) to gather with other inmates would have given him the opportunity to communicate with other inmates with whom he might engage in violence or plan further violence as a follow-up to the riot. Allowing inmates aligned with those who had just rioted to congregate would have been at a cost of increased risk of danger to the inmate population as well as the staff. This factor weighs in favor of upholding the restrictions on group religious activities.

The fourth *Turner* factor requires the Court to consider whether there is an "absence of ready alternatives" to the prison policy. *Turner*, 482 U.S. at 90. The burden is on the prisoner challenging the regulation to show that there are obvious, easy alternatives to the regulation. *See O'Lone*, 482 U.S. at 350; *see also Mauro v. Arpaio*, 188 F.3d 1054, 1063 (9th Cir. 1999). The same safety concern arising from allowing inmates aligned with recent rioters to congregate freely also weighs in favor of defendants on the fourth *Turner* factor. This factor weighs in favor of upholding the restrictions on group religious activities because Chau has identified no ready alternatives to the modified program.

Having considered the various *Turner* factors, the court concludes that the implementation of the modified program and resulting ban on religious group activities was reasonably related to the legitimate penological interests in staff and inmate safety. Chau does not show or raise a triable issue of fact that his right to free exercise of religion was improperly impinged upon by defendants. Defendants are entitled to judgment in their favor on Chau's First Amendment claim.

Chau states that he was not a participant in the violence that led to the modified program and was not a member in the "2-5" disruptive group. *See* Docket # 1 at 7. These statements do not create a triable issue of fact. First, prison officials permissibly could put more than just the participants in the riot on a modified program. Implementing a modified program for the riot participants from the two disruptive groups, *plus* other known members and associates of those two disruptive groups, was legitimately aimed at stopping the spread or recurrence of violence among those two groups and improving the quality of the investigation of the incident. *Cf. Norwood v. Vance*, 591 F.3d 1062, 1065, 1069 (9th Cir. 2010) (defendants entitled to

10

qualified immunity on claim by non-gang member for deprivation of outdoor exercise that occurred during lengthy extended lockdowns following repeated episodes of violence at prison); *id.* at 1069 (officials must balance the requirement to keep inmates safe with the other obligations that our laws impose, such as providing outdoor exercise. When violence rises to unusually high levels, prison officials can reasonably believe it is lawful to temporarily restrict outdoor exercise to help bring the violence under control). The absence of evidence that Chau participated in the riot did not rule out his potential involvement in future acts of violence by the disruptive groups with which he reportedly was aligned. Second, his declared non-membership in the "2-5" disruptive group does not exactly answer defendants' evidence because he does not deny that he was an associate of the disruptive group, which is what the defendants stated was his relationship to the group. Third, there was documentation in his file that he *was* associated with the "2-5" disruptive group, and prison officials reasonably could rely on that documentation in determining that he should be included in the modified program. Fourth, even if he was not an associate of the "2-5" disruptive group, Chau had no federal constitutional right to have his prison records corrected to eliminate incorrect information, and the relatively brief modified program did not implicate a liberty interest of real substance protected by the Due Process Clause. *See Sandin v. Conner*, 515 U.S. 472, 484, 487 (1995); *see, e.g., id.* at 486 (30-day disciplinary segregation was not an atypical and significant hardship giving rise to a protected liberty interest) *see also* Docket # 38 at 2-3 (explaining that this is not a gang validation case). Chau's statements do not undermine the undisputed evidence that there was documentation in his prison file that identified him as an associate of the "2-5" disruptive group and that he was placed on modified program because of that association.

3. Equal Protection Claim

Chau alleges that prison officials treated Muslims differently than inmates of other faiths during the modified lockdown. To survive summary judgment on his equal protection claim, Chau must show a triable issue of fact that defendants intentionally treated Chau differently from similarly situated inmates. *See McCollum v. California Dep't of Corrections and Rehabilitation*,

11

647 F.3d 870, 880-81 (9th Cir. 2011) (granting summary judgment for prison officials on Wiccan prison chaplain's equal protection claim where plaintiff-chaplain, among other things, had failed to articulate which clergy were similarly situated to him).  Chau fails to do so.

Chau states in his complaint that "[n]o other religious group was impacted at all," Docket # 1 at 7, but there is no evidence as to the religious affiliation of any of the other inmates put on the modified program, what (if any) religious group services/activities they were able to attend, and who was affiliated with the "2-5" but not put on the modified program.  The fact that the modified program was implemented in the middle of Ramadan resulted in Muslim inmates losing access to group services at a particularly significant time for their religion, but that does not lead to any reasonable inference that defendants imposed the modified program with an intent to discriminate against Chau because he was a Muslim, especially since the modified program was in response to a riot that also had occurred in the middle of Ramadan.  *See generally Washington v. Davis*, 426 U.S.  229, 239 (disproportionate impact alone does not establish discriminatory purpose).  Chau's generalized statements that Muslim inmates were treated worse than those of other religions are not sufficient to raise a triable issue of fact.  Further, the undisputed evidence shows that Chau's placement on the modified program and the subsequent restriction of his privileges (including access to group religious services) was due to his documented association with a disruptive group that had just been involved in a serious incident of violence, and not for any religious reason.  On the evidence in the record, no reasonable jury could find that defendants denied Chau access to his group religious activities due to impermissible discriminatory intent against Muslim inmates.  Finally, even if the Muslim inmates were subjected to worse treatment than other inmates as a result of the modified program, the modified program passes muster under the *Turner* test as explained in the preceding section.  Defendants are entitled to judgment on the Fourteenth Amendment claim.

### 4.     Qualified Immunity Defense

Defendants also are entitled to qualified immunity against the First and Fourteenth Amendment claims.  The defense of qualified immunity protects government officials "from

12

1  liability for civil damages insofar as their conduct does not violate clearly established statutory
2  or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*,
3  457 U.S. 800, 818 (1982).  To determine whether an official is entitled to qualified immunity,
4  the Court must decide whether the facts alleged show the official's conduct violated a
5  constitutional right; and, if so, whether it would be clear to a reasonable officer that his conduct
6  was unlawful in the situation he confronted.  *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001); *see*
7  *also Pearson v. Callahan*, 555 U.S. 223 (2009) (overruling *Saucier*'s requirement that qualified
8  immunity analysis proceed in a particular sequence).  "[I]f no constitutional right would have
9  been violated were the allegations established, there is no necessity for further inquiries
10 concerning qualified immunity." *Saucier*, 533 U.S. at 201.  The Court has concluded that the
11 evidence fails to show a violation of Chau's First or Fourteenth Amendment rights.  Therefore,
12 defendants prevail on the first prong of the *Saucier* test.  As a matter of law, defendants are
13 entitled to qualified immunity against the First and Fourteenth Amendment claims.

### B.	The Sealed Document

After defendants filed their motion, the court ordered them to file the confidential document(s) from Chau's prison file that supported the determination that he was an asosciate or member of the "2-5" disruptive group or otherwise supported the determination that he should be put on the modified program following the August 22, 2011 riot. *See* Docket # 38 at 3. Defendants then filed the confidential document under seal and moved to extend the time period the document would remain under seal.  Upon due consideration, defendants' motion is GRANTED. Docket # 39. Defendants have demonstrated that the confidential information in the document, if disclosed, would create a severe risk to the safety of other prisoners and institutional security.  They also have demonstrated that the risk presented by disclosure of the document will exist far longer than ten years and that the document should be sealed for longer than the normal ten-year period for the sealing of documents.  Accordingly, the document attached as Exhibit A to the Lopez declaration will be filed under seal and not available for inspection by the public or plaintiff absent a court order permitting such inspection. (Defendants

13

submitted a paper copy of Exhibit A, but Exhibit A is not attached to the e-filed document. Defendants need to e-file Exhibit A under seal.) The documents shall *remain sealed for seventy-five years or until destroyed* in conformance with the normal records destruction policy of the United States Courts, whichever occurs first.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss and for summary judgment is GRANTED. (Docket # 24.) Judgment will be entered in all defendants' favor and against plaintiff. The clerk shall close the file.

IT IS SO ORDERED.

Dated: August 20, 2014

_____
SUSAN ILLSTON
United States District Judge

14